# United States Court of Appeals
## For the First Circuit

No. 07-2240

VAQUERÍA TRES MONJITAS, INC.; SUIZA DAIRY, INC.,

Plaintiffs, Appellees,

v.

CYNDIA E. IRIZARRY, in her official capacity as
Administrator of the Office of the Milk Industry Regulatory
Administration for the Commonwealth of Puerto Rico,

Defendant, Appellant,

JOSÉ O. FABRE-LABOY, in his official capacity as Secretary
of the Department of Agriculture of the Commonwealth of
Puerto Rico; INDUSTRIA LECHERA DE PUERTO RICO, INC. (INDULAC),
PUERTO RICO DAIRY FARMERS ASSOCIATION,

Defendants.

No. 07-2369

VAQUERÍA TRES MONJITAS, INC.; SUIZA DAIRY, INC.,

Plaintiffs, Appellees,

v.

JAIME RIVERA-AQUINO, in his official capacity as Secretary
of the Department of Agriculture of the Commonwealth of
Puerto Rico;

Defendant, Appellant,

INDUSTRIA LECHERA DE PUERTO RICO, INC. (INDULAC);
PUERTO RICO DAIRY FARMERS ASSOCIATION; CYNDIA E. IRIZARRY,
in her official capacity as Administrator of the Office
of the Milk Industry Regulatory Administration for the
Commonwealth of Puerto Rico,

Defendants.

**Before**

**Lynch, <u>Chief Judge</u>,
Torruella, Boudin, Lipez, and Howard,
<u>Circuit Judges</u>.**

---

**ORDER OF COURT**
Entered: March 11, 2010

The petition for rehearing having been denied by the panel of judges who decided the case, and the petition for rehearing en banc having been submitted to the active judges of this court and a majority of the judges not having voted that the case be heard en banc, it is ordered that the petition for rehearing and the petition for rehearing en banc be denied.

-Concurrence and Dissent Follow-

**TORRUELLA**, Circuit Judge (Concurring in the denial of en banc review). Although "the difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between day and night," Edelman v. Jordan, 415 U.S. 651, 667 (1974), I believe that the panel opinion in this case is eminently correct in holding that the Eleventh Amendment does not bar the relief afforded by the district court. This ruling is correct because it is consistent with well-established precedent that places decisive weight on the impact a judgment has on the state treasury. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 49 (1994) ("[T]he vast majority of Circuits . . . have concluded that the state treasury factor is the most important factor to be considered . . . and, in practice, have generally accorded this factor dispositive weight") (first alteration in the original) (internal quotation marks omitted); Libby v. Marshall, 833 F.2d 402, 406 (1st Cir. 1987)(stating that "[t]he damage the Eleventh Amendment seeks to forestall is that of the state's fisc being subjected to a judgment for compensatory relief"). In this case the Eleventh Amendment poses no bar to relief because there is simply no impact on the state fisc, at present or in the future.

In our November 23, 2009 opinion, we affirmed the district court's grant of a preliminary injunction against the

-3-

Milk Industry Regulation Administration for the Commonwealth of Puerto Rico ("ORIL" by its Spanish acronym). In its opinion and order, the district court found that Plaintiffs had shown a likelihood of success on the merits of their claim that ORIL put into place an arbitrary and discriminatory regulatory scheme that violated the Due Process, Equal Protection and Takings clauses of the United States Constitution. As part of the preliminary injunction, the district court directed ORIL to adopt a regulatory mechanism to compensate Plaintiffs for the deficient rate of return that was imposed by ORIL's regulatory scheme from the year 2003. In compliance with the district court's injunctive order, ORIL adopted an administrative order which directed that 1.5 cents from the sale of each quart of milk be earmarked for the purpose of complying with the regulatory accrual mechanism. That is, the money used to comply with the district court's injunction would be paid by the consumers of milk in Puerto Rico. ORIL also adopted Regulation No. 12, which established that the monies raised from the sale of milk be deposited in a special account within the Milk Industry Development Fund.[1]

---

[1] The Fund was created to "promot[e] the production, sale, processing and consumption of fresh milk and its byproducts, and . . . any other activity necessary for the advancement of the milk industry." P.R. Laws Ann. tit. 5, § 1099. It is "supported by contributions from milk producers at the rate of one-half (1/2) cent for each quart of milk produced and accepted by the processors for pasteurizing." Id.

-4-

The dissent from denial of en banc review argues that the injunction issued by the district court contravenes the strictures of the Eleventh Amendment because it makes the Commonwealth liable for payment of monetary relief. There is no basis in the record for this conclusion. The dissent bases this conclusion on two mistaken assumptions: (1) that the monies raised by the regulatory accrual are public funds and (2) that the Commonwealth is or would be required to expend public funds or resources to compensate Plaintiffs. I write separately to dispel these assumptions and to clarify that the Commonwealth's dignitary and fiscal interests are not implicated in this case as to require this court to conclude that sovereign immunity poses a bar to relief.

The dissent suggests that funds deposited in the Milk Industry Development Fund are considered public funds of the Commonwealth, and that therefore, the monies deposited in the special account should be considered public funds. However, we are dealing in this case with monies paid by consumers of milk which can only be used for the purposes designated by the injunction. There is no indication that the funds deposited in the special account would be or can be commingled with the Commonwealth's general revenues, or with the monies deposited in the Milk Industry Development Fund according to the law. More importantly, <u>the Defendants have not argued on appeal that the</u>

monies raised by the regulatory accrual are public in nature. On the basis of the record before us, it is therefore impermissible to suggest, as the dissent does, that the injunction reaches the Commonwealth's funds.

Secondly, there is simply no indication in the record or in the Regulations adopted by ORIL that an eventual judgment ordering disbursal of the monies raised pursuant to the regulatory accrual would be satisfied by public funds or that the Commonwealth's resources would be affected if in due course the Plaintiffs are found entitled to the monies raised by the regulatory accrual.[2] Neither the Commonwealth nor ORIL have been adjudged responsible for contributing funds to the special account, and the contributions made to the account are kept separate from the Commonwealth's general revenues and from the Milk Industry Development Fund's monies. Thus, the revenues raised by the regulatory accrual are special funds that do not make the Commonwealth the real party in interest for Eleventh Amendment purposes. See Hudson v. City of New Orleans, 174 F.3d 677, 689 (5th Cir. 1999) (reasoning that, for Eleventh Amendment

---

[2] The intricacies of the regulatory mechanism that Defendants adopted have not been challenged by the parties. Defendants have not argued on appeal or in their petition for rehearing en banc, that the regulatory mechanism forces the Commonwealth to expend public funds or resources in violation of the Eleventh Amendment. Therefore, any arguments raised by the dissent sua sponte regarding the details of the regulatory accrual are insufficient to justify rehearing in this case.

purposes, the fact that an entity receives state funds which are earmarked for specific or special purposes counsels against finding that the state would be responsible for the entity's debts and obligations); Brown v. Porcher, 660 F.2d 1001, 1006-07 (4th Cir. 1981) (holding that the Eleventh Amendment posed no bar to compensation payable from South Carolina's unemployment compensation fund which was a special fund "insulated" from public monies and separately financed). Cf. Austin v. Berryman, 862 F.2d 1050, 1056 (4th Cir. 1988) (holding that the Eleventh Amendment barred monetary relief against Virginia's unemployment compensation fund which was "integrated" into the state's treasury).

The fact that the special account was created within the Milk Industry Development Fund is insufficient to conclude that the Commonwealth would be required to expend state funds to comply with the injunction. The Commonwealth simply has not been required to appropriate its funds to comply with the regulatory accrual, and given that the funds deposited in the special account are earmarked to comply with the regulatory mechanism, there is no basis to conclude that a final judgment in favor of Plaintiffs would amount to a judgment against the Commonwealth.[3]

---

[3] In fact, the precise compensation that Plaintiffs will be entitled to receive has not been determined as of yet, nor can it be gleaned from the record that the Commonwealth will bear any type of subsidiary monetary liability in this case. Thus, any contention that such an impermissible outcome is within the realm

-7-

The dissent rightly cautions that the analysis of an entity's entitlement to sovereign immunity should not be transformed into a formalistic inquiry. However, the dissent mistakenly criticizes the panel for engaging in this type of inquiry. Far from adopting a formalistic approach towards Eleventh Amendment analysis, the panel's decision considers, from a practical perspective, the Commonwealth's immediate and ultimate liability and holds that sovereign immunity poses no bar to the relief ordered by the district court, precisely because the Commonwealth was not adjudged liable for payment of a monetary judgment, or held in any fashion subsidiarily responsible for providing the funds that nurture the special account.

Likewise, the dissent errs in asserting that the panel's decision is inconsistent with the Supreme Court's decision in Regents of the University of California v. Doe, 519 U.S. 425 (1997). In Doe, the Supreme Court held that the Eleventh Amendment barred a claim for monetary relief against the State of California, even though the damages would be paid by a third party. For Eleventh Amendment purposes, the Supreme Court found it irrelevant that the State of California had been relieved of its obligation to pay a judgment because a third party would cover the state's liability. In Doe, the State of

of possibility on the present record, is beyond speculation.

-8-

California assumed an obligation upon a finding of liability. In contrast, the district court has never adjudged the Commonwealth liable for monetary relief in this case. Thus, while the Supreme Court clarified in Doe that the state's potential legal liability was the relevant factor in the Eleventh Amendment question regardless of the possibility of third-party indemnification, in this case the Commonwealth has not been held legally or potentially liable for compensatory damages. That is, the consumers of milk in Puerto Rico are not relieving the Commonwealth of its liability, since the Commonwealth has not been adjudged liable for the type of compensatory damages that the State of California was potentially liable for in Doe.[4] Rather than contravening our panel decision, the Supreme Court's decision in Doe supports the conclusion that where there is no basis to find that the state is potentially liable for monetary compensation, the Eleventh Amendment poses no bar to relief, such as the one ordered by the district court in this case.

Doe established that the state's legal liability is a crucial consideration in Eleventh Amendment analysis. But that liability is inextricably bound to the overriding question of

_____

[4] The Supreme Court's decision in Doe is distinguishable because it dealt with an indemnification agreement between the State and a third party. This contractual relationship had nothing to do with the relationship between the state and the plaintiff who sought relief against the state in federal court. That is, the presence of third-party indemnitor in Doe failed to alter the state's liability towards the plaintiff.

-9-

whether the state would be "legally and practically" required to pay a monetary judgment. See Hess, 513 U.S. at 51 (stating, that where "legally and practically" the state would not be required to cover the entity's indebtedness, "the Eleventh Amendment's core concern is not implicated"). In this case, however, it is pure speculation to state that the Commonwealth is legally, practically or potentially bound to expend funds in the event that the monies raised from milk sales prove insufficient to compensate the milk producers. Unlike Doe where the State of California was considered to be potentially liable to plaintiffs, the Commonwealth's liability in this case is speculative in nature. As I have stated, the funds used to comply with the district court's injunction are raised from the price consumers pay for milk and the revenues are kept in a special account which is segregated from the Commonwealth's funds. Rather than imposing potential liability on the Commonwealth or its agencies, this regulatory mechanism imposes an obligation on the consumers of milk and carefully shields the Commonwealth's funds and resources from potential liability. Therefore, the dissent's claim that the Commonwealth would be required to pay a monetary judgment is speculative and is insufficient to conclude that the district court's order violates the Eleventh Amendment.

Pursuant to the Supreme Court's decision in Doe, the issue of whether a monetary judgment against a state official is

-10-

enforceable against the state is still a crucial consideration in Eleventh Amendment analysis. 519 U.S. at 430 (explaining that the Court in Hess "focused particular attention" on the fact that the states would not have been obligated to pay the judgment). See, e.g., Fresenius Med. Care Cardiovascular Res. Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 65 (1st Cir. 2003)(explaining that the vulnerability of the state's purse is a salient factor in Eleventh Amendment arm-of-the-state analysis and stating that where it is clear that the state's treasury is not at risk, the control exerted by the state over the entity does not entitle the state to immunity); Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth., 991 F.2d 935, 939 (1st Cir. 1993)("The Eleventh Amendment's primary concern is to minimize federal courts' involvement in disbursal of the state fisc."). Thus, the panel's opinion is consistent with settled precedent that examines an entity's entitlement to sovereign immunity through the prism of the financial burden actually or potentially imposed on the state.

Finally, the dissent mistakenly contends that the panel's decision ignores the Commonwealth's dignitary interests, which are protected by the Eleventh Amendment. In examining the contours of the state's sovereign immunity, the Supreme Court has explained that the Eleventh Amendment confirms the very essence of the principle of dual sovereignty embedded in the nation's

-11-

constitutional structure.  Blatchford v. Native Vill. of Noatak &
Circle Vill., 501 U.S. 775, 779 (1991).  Though the injunction
requires ORIL to adopt the regulatory mechanism, ORIL was not
stripped of its power to set the price of milk and to regulate
the Milk Industry.  Given that ORIL retains control over the milk
industry, the panel rightly concluded that the regulatory accrual
has not burdened the Commonwealth's entitlement to respect as a
sovereign entity in a manner that contravenes the Eleventh
Amendment.

In sum, the panel's decision in this case evaluates the
substance of the relief afforded by the district court and draws
the line against the application of sovereign immunity.  This
case simply does not involve a monetary award against the state
that burdens the state's treasury, nor does it implicate the
Commonwealth's dignitary interests in a manner offensive to the
Eleventh Amendment.  I therefore concur with the majority in
denying en banc review.

**LYNCH, <u>Chief Judge</u>, dissenting from the denial of en banc review.** With the greatest respect for my colleagues, I disagree with the decision to deny en banc review and think the serious issues raised deserve greater attention from this court and, failing that, from the Supreme Court.

Review en banc is sought by defendant state officials from Puerto Rico's Milk Regulatory Board (Spanish acronym "ORIL"), and the Commonwealth's Secretary of Agriculture, on the ground that the Eleventh Amendment prohibits the remedy ordered by the district court and affirmed by the panel. That remedy was an injunction that forces the Administrator of ORIL, a state administrative agency, to retroactively compensate plaintiffs for the profits they say ORIL deprived them of from 2003 to the time the injunction went into effect in 2007. Under that compulsion the defendant state officials imposed a new surcharge on consumers, the funds from which go into a state-administered public fund and are to be used for the sole purpose of paying plaintiffs for their compensatory damages. Surely this raises significant Eleventh Amendment immunity concerns.

The panel held that there is no Eleventh Amendment bar because the relief took the form of an injunction and the injunction did not force the Commonwealth to satisfy the judgment with funds directly paid from or funneled through the state treasury. That is not, in my view, the appropriate test under

-13-

the Supreme Court's Eleventh Amendment jurisprudence, and it will lead to federal court orders designed to evade the requirements of the Eleventh Amendment.

I believe the panel has misread Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30 (1994), and has done so in a way which is inconsistent with more than a decade's worth of subsequent Supreme Court precedents, including Regents of the University of California v. Doe, 519 U.S. 425 (1997), and Federal Maritime Commission v. South Carolina State Ports Authority, 535 U.S. 743 (2002), as well as our circuit precedent in Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp., 322 F.3d 56 (2003), and precedent from other circuits. The importance of this issue and its stakes for the states in the many cases in which individuals seek compensation for past constitutional violations make this, in my view, a case warranting en banc review. The issues raised are admittedly difficult, and there is no Supreme Court case directly on point.

## I. Facts

Like many states in the United States, the Commonwealth of Puerto Rico extensively regulates its dairy industry. ORIL, a division of the Puerto Rican Department of Agriculture, is the relevant administrative agency performing this function. Through its regulations, ORIL controls all aspects of the Puerto Rican

-14-

milk industry.  See generally J.W. Gruebele and L.F.C. Barahona, Growth of the Dairy Industry in Puerto Rico, 14 Illinois Agric. Econ. 32 (1974).  Among the ways it does so are by setting the price Puerto Rican consumers pay for processed fresh milk, the margins that all domestic dairy farmers, milk processors, retailers, and distributors receive from the consumer price, and the internal price that milk processors pay to buy raw milk from dairy farmers.  See P.R. Laws Ann. tit. 5, §§ 1096, 1107.

The plaintiffs, Puerto Rico's two fresh milk processors, brought a civil rights suit under 42 U.S.C. § 1983 against the Administrator of ORIL and the Secretary of Agriculture in their official capacities, claiming that ORIL's pricing scheme was unconstitutionally arbitrary and had, since 2003, deprived them of profits to which they were entitled.[5] Plaintiffs' requested relief included "a temporary mechanism for plaintiffs to recover the losses they have experienced on account of the unconstitutional regulation herein under attack."

On July 13, 2007, the federal district court of Puerto Rico held that since 2003, ORIL's price scheme had been violating the Due Process Clause, the Equal Protection Clause, the dormant

_____

[5]     Specifically, plaintiffs claimed that since 2003, ORIL had used outdated economic data and had unfairly favored dairy farmers and other entities at the expense of fresh milk processors when formulating the annual pricing schemes for the milk industry. Plaintiffs claimed they were therefore unable to obtain reasonable profits.  They alleged violations of, inter alia, the Due Process Clause, the Equal Protection Clause, and the Takings Clause.

Commerce Clause, and the Takings Clause of the United States Constitution. See Vaquería Tres Monjitas v. Fabré Laboy, No. 04-1840 (D.P.R. July 13, 2007). It issued a preliminary injunction which provided in relevant part:

> The Administrator [of ORIL] is ordered to adopt a temporary mechanism that will allow the processors to recover the new rate of return they are entitled to (whatever that may be) for the year 2003 (base cost year of the present [price] structure) and up to the day when they begin to recover said rate based on the new regulatory standards and corresponding order. The Administrator may so act through regulatory accruals, special temporary rates of return or any other available mechanism of his choosing. The period for this special recovery shall be reasonably determined by the Administrator. The Administrator will hold hearings for this purpose with the participation of plaintiffs, and all parties within the milk industry, within a period of thirty (30) days of this Opinion and Order. A decision of the Administrator shall follow promptly.

Id. at 102 (emphasis added).

The panel depicts the regulatory accrual mechanism ORIL adopted pursuant to this injunction as an informal remedy that would not require any state action beyond the initial price order and would not be collected or retained by the Commonwealth. See Vaquería Tres Monjitas, 587 F.3d at 479. The facts do not support that characterization. ORIL promulgated the regulatory accrual mechanism through a formal regulation and administrative order subject to Puerto Rico's Uniform Administrative Procedure Act, P.R. Laws Ann. tit. 3, § 2121 et seq. Like a tax, the

-16-

mechanism raises revenue through a method available only to sovereigns. It also entails extensive state involvement well beyond the promulgation of the initial price order.

The regulatory accrual mechanism works as follows. On April 17, 2008, after nine months and 375 docket entries' worth of further litigation over the terms of the injunction, ORIL issued a regulation and administrative order setting forth the details of the mechanism. The regulation created a special fund (called "the reserve for the eventual compensation for losses caused to the processing plants by the previous regulations") out of which plaintiffs' past losses were to be paid. ORIL did this by adding the regulatory accrual as one of the costs to be included in determining the new price of milk that consumers would pay in Puerto Rico. "This contribution for the abovementioned compensation," the regulation continued, "shall be retained and deposited in a special account in the Milk Industry Development Fund, which will keep and manage the special account in compliance with the orders it receives from the administrator of [ORIL]."[6]

_____

[6] The Milk Industry Development Fund (Spanish acronym "FFIL") was established to promote the fresh milk industry. It is administered by an Administrative Board chaired by the Administrator of ORIL, and by law, "[a]ll monies in the Fund . . . shall be acknowledged as depositories of funds of the Commonwealth of Puerto Rico, but they shall be kept in an account or accounts under the name of the Fund." P.R. Gen. Laws. Ann. tit. 5, § 1099(e). Thus, Puerto Rican law characterizes the funds in the account as funds of the Commonwealth of Puerto Rico.

In an accompanying administrative order, ORIL also set a new price structure for the consumer price of fresh milk in Puerto Rico.[7] Originally, ORIL, pursuant to an agreement with plaintiffs, determined that 1.25 cents from every quart of milk sold to consumers would go into the special account for plaintiffs' compensation. A July 22, 2008 ORIL regulation increased that amount to 1.50 cents per quart. Under compulsion of the injunction, in August 2008, ORIL and plaintiffs also agreed that plaintiffs would be compensated out of the fund for their past damages from December 31, 2002 to December 31, 2007, but did not reach the issue of prospective compensation for 2008. These regulations and administrative orders were subject to the formal requirements of Puerto Rico's Uniform Administrative Procedure Act, including a notice and comment period.

## II. Legal Analysis

When a state official is sued in his or her official capacity but the state is the true party in interest, the suit is barred under the Eleventh Amendment and the state cannot be subject to such a suit without its consent. See Edelman v. Jordan, 415 U.S. 651, 663 (1974). "Relief that in essence serves

---

[7] Specifically, the new price structure set the consumer price of fresh milk in Puerto Rico ($1.32) and divided the revenues per quart among retailers ($0.09), distributors ($0.02), fresh milk processors ($0.39), dairy farmers ($0.805), the new cost to ORIL of "future audits and regulatory activities" ($0.0025), and the special account contribution for regulatory accrual ($0.0125).

to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law" is a classic example of what the Eleventh Amendment prohibits.  Papasan v. Allain, 478 U.S. 265, 278 (1986).  This is so irrespective of whether "the relief is expressly denominated as damages."  Id.  "[I]f the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else," the Eleventh Amendment prohibits it.  Id.

There can be no doubt that the injunction at issue makes the Commonwealth, through one of its administrative agencies, liable for retrospective monetary relief.  By its terms, the injunction is directed against the Administrator of ORIL, an administrative agency within the Department of Agriculture that Puerto Rico has clearly structured as an arm of the state.  See Fresenius, 322 F.3d at 65.  It is equally clear that the regulatory accrual compelled by the injunction is retrospective, not prospective.[8]  Plaintiffs, the district court,

---

[8]     The district court clearly erred when it characterized the relief as "prospective injunctive relief against the Defendants to avoid insolvency" as opposed to retrospective compensatory relief. See Vaquería Tres Monjitas, No. 04-1840, slip op. at 13-14 (D.P.R. Oct. 2, 2006) (order denying motions to dismiss).  Plaintiffs say the regulatory accrual is really prospective because its purpose is to rebuild plaintiffs' capital base and no pricing structure, going forward, would be effective without this step.  But that argument would open the floodgates to retrospective compensation in almost any situation.   The panel opinion assumed this relief was retrospective and rested its holding on the theory that retroactive compensatory relief that does not come directly from the state treasury does not violate the Eleventh Amendment.  Vaquería Tres

-19-

and subsequent ORIL regulations implementing the injunction have all characterized the regulatory accrual as a way to allow plaintiffs to recover the past profits they say they lost between 2003 and the time of the injunction. It appears indistinguishable from "the award, as continuing income rather than as a lump sum, of an accrued monetary liability," which the Supreme Court has long characterized as retrospective monetary relief barred by the Eleventh Amendment. Papasan, 478 U.S. at 281 (internal quotation marks and emphasis omitted); Edelman, 415 U.S. at 668 (holding that payment of state funds as compensation to plaintiffs whose benefits were delayed by slow processing times was "indistinguishable in many aspects from an award of damages against the State"); see also Whalen v. Mass. Trial Court, 397 F.3d 19, 29-30 (1st Cir. 2005) (holding that the restoration of service credit following past termination is impermissible retrospective compensation); Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1220-21 (11th Cir. 2000) (holding that an injunction "to prescribe a set of standards upon which Defendants are to provide reimbursement for inadequate past and future payments" is barred).

The panel opinion nonetheless held that the Eleventh Amendment is not an issue because the "state treasury" is not

Monjitas, 587 F.3d at 478.

-20-

involved.[9]  That conclusion, to my mind, is doubtful.  First, the conclusion assumes that if third parties--here, consumers-- provide the funds the Commonwealth uses to compensate plaintiffs and the payments are not made directly out of the state treasury, the state's Eleventh Amendment interests are not involved. Second, the conclusion assumes that payments from an

_____

[9]     Plaintiffs suggest in the alternative that First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304 (1987), held, and our caselaw supports, the proposition that retroactive compensation for a Takings Clause claim is an exception to the Eleventh Amendment's usual bar on retrospective relief.  The panel opinion rests instead on the ground that the regulatory accrual was an equitable remedy because there was no formal award of damages.  Vaquería Tres Monjitas, 587 F.3d at 479-80.
     Plaintiffs' position misinterprets the holdings of Parella v. Retirement Board of Rhode Island Employees' Retirement System, 173 F.3d 46 (1st Cir. 1999), and Tenoco Oil Co., Inc. v. Department of Consumer Affairs, 876 F.2d 1013 (1st Cir. 1989).  Parella did not hold that the Eleventh Amendment allows the recovery of just compensation for temporary takings despite its retrospective nature.  It was instead concerned with the complications such a position could pose for courts if Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), were interpreted to require courts to reach Eleventh Amendment questions before other dispositive issues.  173 F.3d at 56-57.  Tenoco mentioned First English only in passing and disposed of the case on the ground that permanent injunctions should not be imposed prior to final administrative actions.  876 F.2d at 1028-29.
     In any event, First English did not squarely present an Eleventh Amendment question, since it involved a suit against a county, which cannot invoke Eleventh Amendment immunity.  482 U.S. at 308.  And in the analogous context of compensation for reverse condemnation claims, we have stated that the Eleventh Amendment bars federal courts from granting this relief.  See Citadel Corp. v. P.R. Highway Auth., 695 F.2d 31, 33 n.4 (1st Cir. 1982); see also Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 954-56 (9th Cir. 2008) (holding that the Eleventh Amendment bars retroactive compensation both under the Takings Clause and for reverse condemnation claims under the Due Process Clause).

-21-

administrative fund created and maintained as public funds do not involve the state's fisc.

Third, the panel opinion, in my view, most likely departs from precedent when it holds that the Eleventh Amendment is not involved when the Commonwealth is ordered to raise money from individuals through mechanisms other than a general tax that produces funds for the state treasury. This provides an easy mechanism for evasion of the Eleventh Amendment. A key purpose of the Eleventh Amendment is to protect the state's dignitary interests in how it chooses to impose surcharges, fees, and alternatives to taxation to provide funds for public purposes.

Whether an action in practice aims to recover money from a state, in violation of the Eleventh Amendment, is a functional question, and Regents of the University of California v. Doe, 519 U.S. 425 (1997), expressly rejected the argument that Eleventh Amendment immunity turns upon "a formalistic question of ultimate financial liability." Id. at 431. Instead, "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." Id.

Thus, Doe held that the Eleventh Amendment barred a suit against the University of California, an arm of the state, that made the entity legally liable for compensatory relief even

-22-

though the judgment would not, in practice, be paid by the state because of an indemnity arrangement.[10]  Id. at 426.  Perhaps Doe is no more than a variation on the usual collateral source rule, but I am doubtful it is so limited.

The injunction orders the Administrator of ORIL to use the state's regulatory, revenue-raising powers to satisfy plaintiffs' demand for compensation for lost profits from 2003 to the time of the injunction, and ORIL adopted the regulatory accrual mechanism to comply with the injunction.  The only reason this mechanism exists is to recover enough money so that plaintiffs get four years' worth of past lost profits.  The mechanism is an option ORIL can use to satisfy the judgment only because the Commonwealth's powers over the milk industry in Puerto Rico are so extensive.  The fact that the payments may not already have been made is irrelevant.  And if this mechanism failed--if, for instance, consumers bought less fresh milk in response to the raised prices and the regulatory accrual failed to accumulate the significant sums needed to repay plaintiffs--

------------------------------------------------

[10]    Another circuit, applying Doe, has rejected the claim that the Eleventh Amendment is not implicated so long as a judgment against a state does not require any new expenditures from the state treasury.  "[T]he proper inquiry is not whether the state treasury would be liable in this case, but whether, hypothetically speaking, the state treasury would be subject to 'potential legal liability' if the [source in question] did not have the money to cover the judgment."  Ernst v. Rising, 427 F.3d 351, 362 (6th Cir. 2005) (en banc).  The panel opinion puts our circuit in conflict with the Sixth Circuit.

there is no indication ORIL would not still be on the hook for plaintiffs' lost profits. The prospect of such liability may well be enough to make the Eleventh Amendment a shield. See Doe, 519 U.S. at 431; see also Fed. Maritime Comm'n., 535 U.S. at 766-67.

When a state raises revenues through the methods available to it as a sovereign--including taxation and regulatory orders--rather than by withdrawing existing funds in the state treasury, this surely does not remove the Eleventh Amendment's protections. Either way, the state fisc is affected because the state is being required "to use its own resources" to replace the original source of the plaintiffs' profits. Papasan, 478 U.S. at 281. The regulatory accrual ORIL has adopted under compulsion by the district court essentially imposes a tax on Puerto Rican consumers: it increases the overall price of milk to consumers and channels 1.50 cents from every quart to compensate the plaintiffs for their lost profits. ORIL then sequesters this money in an account in the FFIL, not unlike the way tax revenues are collected.[11] The fact that the special account in the FFIL

---

[11]    Indeed, the regulatory accrual mechanism here functions similarly to the pricing scheme Massachusetts imposed to charge milk dealers additional money for the benefit of in-state dairy farmers in West Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994). Under that mechanism, Massachusetts, which at the time exercised considerable regulatory control over in-state milk prices, ordered every milk dealer operating in Massachusetts to make a monthly payment into the "Massachusetts Dairy Equalization Fund," a special account, which was then distributed to Massachusetts producers

was created to comply with the injunction and that the money in the account was never previously held by the state is irrelevant. "Where [the state] gets the money to satisfy a judgment is no concern of the plaintiff or the court; what matters is that the judgment runs against the state." Paschal v. Jackson, 936 F.3d 940, 944 (7th Cir. 1991) (internal quotation marks omitted).

Moreover, the injunction does force the Commonwealth to expend funds from its own public funds to pay plaintiffs' lost profits.[12] Under the regulatory accrual mechanism, the money collected from consumers goes into a special account in the FFIL that is controlled and administered by ORIL for eventual disbursal to plaintiffs. And all monies stored in the FFIL are, as a matter of Puerto Rican law, considered depositories of the Commonwealth. This is plainly relief that reaches the state fisc.

The fact that this is a special fund and not intermingled with the Commonwealth's general revenues does not remove Eleventh Amendment scrutiny. Reliance on this fact again

---

every month. Id. at 190-91. The Supreme Court described this pricing scheme as "effectively a tax." Id. at 194.

[12] Defendants' Eleventh Amendment argument on appeal rested on the theory that the regulatory accrual effectively made ORIL, an arm of the state, liable for retroactive compensation. Under defendants' theory, these funds were by definition state funds, and the issue of whether the regulatory accrual implicates the state treasury is therefore before us. In any event, questions of Eleventh Amendment immunity can be raised by this court sua sponte, see Parella, 173 F.3d at 55.

elevates form over substantive reality. Doe certainly suggests that this kind of distinction is irrelevant. Even before Doe, the Supreme Court had long suggested that the definition of a state "treasury" includes segregated funds held in special accounts, not just the state's general revenue accounts. See, e.g., Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573, 576 (1946); Great N. Life Ins. Co. v. Read, 322 U.S. 47, 52-53 (1944); see also Esparza v. Valdez, 862 F.2d 788, 794 (10th Cir. 1988). This is so even if the source of the funds came from third parties like the federal government and not from an existing pool of state money. See, e.g., Paschal, 936 F.2d at 944. Practical considerations also favor this approach. Defining the state's "treasury" to mean money in a state's general revenues account and not elsewhere would turn the Eleventh Amendment into an exercise in forensic accounting. I admit that this case may be viewed as another example of a "spectrum" problem. What is involved is not a tax but an administrative surcharge. But the Court, understandably, has preferred harder, bright line rules.

The panel's legal analysis of the Eleventh Amendment issue also seems to me to ignore another state interest the Supreme Court has identified. The Court has held that a single-minded focus on whether relief comes directly from the state treasury or otherwise threatens states' financial welfare

-26-

"reflects a fundamental misunderstanding of the purposes of sovereign immunity." Fed. Maritime Comm'n, 535 U.S. at 765. The Eleventh Amendment "serves the important function of shielding state treasuries," but "the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns," and that broader concern must inform the analysis.[13] Id. (internal quotation marks omitted); see also id. at 760.

My concern is not with some collection of vague interests which might be labeled "dignitary" interests. It is plain that the power to tax--and presumably analogous regulatory means of raising revenue--is "central to state sovereignty." See Dep't of Revenue v. ACF Indus., Inc., 510 U.S. 332, 345 (1994). Surely we must consider whether these interests are offended when a district court orders state officials to enact an elaborate regulatory scheme that imposes surcharges, special fees, or user

---

[13] This is not to say that our inquiry must swing to a single-minded focus only on whether a given suit offends a state's dignitary interests. As the Supreme Court clarified in Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635 (2002), whether a suit can proceed under Ex Parte Young turns on "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Id. at 645 (alteration in original) (internal quotation marks omitted). But as other circuits have concluded, the state's sovereign interests are still relevant to the analysis and should not be ignored. See, e.g., Virginia v. Reinhard, 568 F.3d 110, 119-21 (4th Cir. 2009) (considering whether the state's "special sovereign interests" would be implicated in an Ex Parte Young action by a state administrative agency against state officials); Union Elec. Co. v. Mo. Dep't of Conservation, 366 F.3d 655, 658 (8th Cir. 2004).

fees in order to raise and pay out money in damages rather than simply withdrawing plaintiffs' retroactive compensation from the state treasury.  If courts can evade Eleventh Amendment constraints by dictating to states that they find ways in which state officials can use the state's regulatory money-raising powers to satisfy a money judgment, the Eleventh Amendment's bar against retrospective monetary relief becomes a nullity.

My concerns are raised against the backdrop that the Court's refashioning of the interests at stake under the Eleventh Amendment has, in the wake of Doe and Federal Maritime Commission, reshaped the test for when an entity is an arm of the state.  See Fresenius, 322 F.3d at 63, 67-68 (holding that the arm-of-the-state inquiry depends on a multi-factor test beginning with the way the state structures an entity and does not rely exclusively on whether damages against the entity would be paid from the state treasury); see also Cooper v. Se. Penn. Transp. Auth., 548 F.3d 296, 301 (3d Cir. 2008) ("In light of Doe and FMC, we held that we can no longer ascribe primary to the [state-treasury] factor in our sovereign immunity analysis") (internal quotation marks omitted).  We must face up to the way these transformations in Eleventh Amendment doctrine also affect the underlying immunity question.

For these reasons, I respectfully dissent from the denial of en banc review.

By the Court:

/s/ Margaret Carter, Clerk

cc: Ms. Bertolez-Elvira, Mr. Lopez, Ms. Caicedo-Santiago, Mr. Peirats, Mr. Blasini-Gonzalez, Mr. Asencio, Mr. Berrios Perez, Mr. Nadal-Colon, Mr. Escalera-Rodriguez, Ms. Oliver-Falero, Mr. Lazaro-Paoli, Mr. Nassar-Rizek, Mr. Hill-Tollinche, Ms. Brown-Vazquez, Ms. Pineiro-Soler, Mr. Carlos Deliz, Mr. Ortiz-Morales, Ms. Menendez-Calero, Mr. Longo Quinones, Ms. Rivera Ruiz, Mr. Hernandez Sanchez, Mr. Graffam, Ms. Oronoz-Rodriguez, Mr. Mendez-Gomez, Mr. Rivera-Vicente,  Ms. Gonzalez-Velez, Mr. Ramirez-Ramos, Mr. Alfonso-Rodriguez, & Mr. Colon-Alicea.